## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| 1) JONATHAN SCRIPTURE, on Behalf of Himself and All Others Similarly Situated, | Case No. |
| Plaintiff, | CLASS ACTION |
| v. | |
| 1) EQUAL ENERGY LTD., 2) DON KLAPKO, 3) MICHAEL DOYLE, 4) VICTOR DUSIK, 5) ROBERT WILKINSON, 6) LEE CANAAN, 7) MICHAEL COFFMAN, 8) KYLE TRAVIS, 9) PETROFLOW ENERGY CORPORATION, and 10) PETROFLOW CANADA ACQUISITION CORP., | CIV-14-114-F |
| Defendants. | |

## COMPLAINT

Plaintiff, by his attorneys, submits this Class Action Complaint against the defendants named herein.

### SUMMARY OF THE ACTION

1.     This is a class action brought by plaintiff, in his individual capacity and on behalf of all other similarly situated shareholders of Equal Energy Ltd. ("Equal Energy" or the "Company"), against Equal Energy, members of Equal Energy's Board of Directors (the "Board" or "Individual Defendants"), Petroflow Energy Corporation ("Petroflow"), and Petroflow Canada Acquisition Corp. ("Petroflow Sub") for breach of fiduciary duties and violations of federal securities laws.  This matter arises out of defendants' pursuit of a

sale of Equal Energy to Petroflow (the "Proposed Transaction") at the unfair price of $5.43 in cash per Equal Energy share (the "Proposed Consideration"), and through an unfair process that involved defendants' dissemination in bad faith of a false and misleading proxy statement in violation of sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 of the U.S. Securities and Exchange Commission ("SEC") promulgated thereunder.

2.     Equal Energy is an oil and gas exploration and production company incorporated in Alberta, Canada, and based in Oklahoma City, Oklahoma. On December 9, 2013, Equal announced it had entered into a definitive Arrangement Agreement with Petroflow (the "Arrangement Agreement") under which Petroflow will acquire the Company for a mere $5.43 per share in cash.  The Proposed Transaction will result in little to no premium for Equal Energy shareholders, and in truth, represents a discount to the $5.72 per share price Equal Energy stock was trading in the days leading up to the announcement of the Proposed Transaction.

3.     The inadequacy of the Proposed Consideration is evidenced by the Company's recent business prospects.  Equal Energy reported on November 7, 2013, that its Hunton drilling program had a *100%* success rate during the third quarter of 2013. Moreover, Equal Energy's revenues for the third quarter of 2013 totaled $16.6 million, up *40%* from $11.9 million a year earlier.  Commenting on these results, defendant Don Klapko ("Klapko"), Equal Energy's President and Chief Executive Officer ("CEO"), stated, *"Our drilling continues to deliver higher than budgeted reserves and production at an attractive cost...*  Having averaged over 6,700 barrels for the third quarter, *we are*

*confident we will exceed our target production* of 6,400 [barrel of oil equivalent per day] on average for the full year 2013."

     4.     In addition to failing to account for Equal Energy's recent operating results, the Proposed Transaction is also unfair and inadequate because the intrinsic value of the Company is materially in excess of the Proposed Consideration.  The inadequacy of the Proposed Transaction is demonstrated by the fact that: (i) the Company traded higher than the offer price just days before the Proposed Transaction was announced; (ii) there is at least one analyst that set a price target for the Company well above the Proposed Consideration price of $5.43 per share; (iii) the 1.1% one-day premium offered to Equal Energy shareholders is over *sixteen* times less than the average one-day premium of nearly *18%* offered in similarly sized deals within the last five years; and (iv) several of the Company's largest shareholders, including, but not limited to, Montclair Energy, LLC ("Montclair") and Lawndale Capital Management, LLC ("Lawndale"), have reacted negatively to the Proposed Transaction.

     5.     In order to lock in the Proposed Transaction at the unfair Proposed Consideration, the Board entered into numerous preclusive and onerous deal protection devices, as set forth in the Arrangement Agreement dated December 6, 2013, filed in a Current Report on Form 8-K with the SEC on December 10, 2013.  These provisions, which further diminish the chances of obtaining maximum value for the Company's shareholders by collectively precluding any competing offers for the Company, include: (i) a no-solicitation clause precluding Equal Energy from seeking a better offer for its shareholders; (ii) a five business-day matching rights period during which Petroflow can

match any superior proposal received by the Company; and (iii) a termination fee of $2 million if the Company accepts a competing bid.

6.     In addition to the deal protection devices above, the Company and Petroflow entered into the Lock-Up and Support Agreement ("Lock-Up Agreement") with the directors and officers of Equal Energy covering a total of *693,065* common shares.   Under the Lock-Up Agreement, the directors and officers of Equal Energy agreed, among other things, to vote their Equal Energy holdings: (i) in favor of approving the Proposed Transaction; and (ii) against any alternative proposals to acquire Equal Energy.   The onerous and preclusive deal protection devices operate conjunctively with the Lock-Up Agreement to make the Proposed Transaction a *fait accompli* and ensure that no competing offers will emerge for the Company.   These provisions reflect an attempt by the Board to lock up the Proposed Transaction at a price that grossly undervalues the Company while simultaneously securing for themselves certain personal benefits not shared equally by Equal Energy's public shareholders.

7.     Specifically, while the Company's shareholders will lose control of Equal Energy at an unfair price, the Company's fiduciaries will receive immediate benefits from the closing of the Proposed Transaction.   For instance, members of the Board and Company management will receive over *$22.7 million* from the sale of their illiquid Equal Energy holdings.   In addition to cashing in their otherwise illiquid shares, Equal Energy's officers and directors will receive millions of dollars in special payments for currently unvested stock options, performance units, and restricted shares, all of which shall, upon the closing of the Proposed Transaction, become fully vested and exercisable.

Finally, defendant Klapko and other members of senior management are also entitled to receive millions of dollars in change-of-control payments. These benefits, none of which is shared equally by Equal Energy's public shareholders, were key factors in the Individual Defendants' decision to pursue the Proposed Transaction.

8.      In order to induce Equal Energy's shareholders to approve the Proposed Transaction and guarantee their personal benefits, the Individual Defendants filed with the SEC on December 31, 2013, the materially false and misleading Preliminary Proxy Statement (the "Proxy"). The Proxy, which recommends that Equal Energy shareholders vote in favor of the Proposed Transaction, omits and/or misrepresented material information in contravention of sections 14(a) and 20(a) of the Exchange Act regarding: (i) the process leading up to the announcement of the Proposed Transaction; (ii) the financial analyses underlying the Proposed Consideration performed by Global Hunter Securities, LLC ("GHS"), the Board's financial advisor; (iii) conflicts of interest affecting GHS; and (iv) the Company's financial projections.

9.      In pursuing the unlawful plan to induce Equal Energy's shareholders to approve the Proposed Transaction via an unfair and uninformed process, each of the defendants violated applicable law by directly breaching and/or aiding the other defendants' breaches of their fiduciary duties of loyalty, due care, diligence, independence, good faith, and fair dealing. In particular, the Individual Defendants have engaged in actions intended to benefit insiders at the expense of the Company's public shareholders.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction in this case over all causes of action asserted herein pursuant to 28 U.S.C. §1332(a)(2) because plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  In addition, this Court has jurisdiction in this case arising under Article III of the United States Constitution and 28 U.S.C. §1331 because of claims arising under sections 14(a) and 20(a) of the Exchange Act.  This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

11.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District Courts permissible under traditional notions of fair play and substantial justice.

12.     Venue is proper in this Court in accordance with 28 U.S.C. §1391(a) because: (i) Equal Energy maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Equal Energy, occurred in this District; and (iv) defendants have received substantial compensation in this

District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

13.     Plaintiff Jonathan Scripture has been a shareholder at all times relevant hereto and is a shareholder of Equal Energy.  Plaintiff is a citizen of Indiana.

14.     Defendant Equal Energy is an Alberta, Canada, corporation with principal executive offices located at 4801 Gaillardia Parkway, Suite 325, Oklahoma City, Oklahoma.  Accordingly, defendant Equal Energy is a citizen of Canada and Oklahoma. Defendant Equal Energy is an oil and gas exploration and production company with substantial production and assets centered on the Hunton liquids-rich natural gas property in Oklahoma.  Upon completion of the Proposed Transaction, defendant Equal Energy will become an indirect wholly-owned subsidiary of defendant Petroflow.

15.     Defendant Klapko is Equal Energy's President, CEO, and a director and has been since June 2008.  In connection with the Proposed Transaction, defendant Klapko entered into the Lock-Up Agreement with defendant Petroflow Sub, pursuant to which he agreed to vote his shares, representing 1.8% of Equal Energy's outstanding common stock, in favor of the Proposed Transaction and against any alternative proposals. Defendant Klapko is a citizen of Canada.

16.     Defendant Michael Doyle ("Doyle") is Equal Energy's Chairman of the Board and has been since May 2013 and a director and has been since December 2007. On information and belief, defendant Doyle was also a member of the Special Committee that evaluated the Proposed Transaction and recommended its approval to the Board.  In

connection with the Proposed Transaction, defendant Doyle entered into the Lock-Up Agreement with defendant Petroflow Sub, pursuant to which he agreed to vote his shares in favor of the Proposed Transaction and against any alternative proposals.  Defendant Doyle is a citizen of Canada.

17.     Defendant Victor Dusik ("Dusik") is an Equal Energy director and has been since February 2008.  On information and belief, defendant Dusik was also a member of the Special Committee that evaluated the Proposed Transaction and recommended its approval to the Board.  In connection with the Proposed Transaction, defendant Dusik entered into the Lock-Up Agreement with defendant Petroflow Sub, pursuant to which he agreed to vote his shares in favor of the Proposed Transaction and against any alternative proposals.  Defendant Dusik is a citizen of Canada.

18.     Defendant Robert Wilkinson ("Wilkinson") is an Equal Energy director and has been since May 2011.  On information and belief, defendant Wilkinson was also a member of the Special Committee that evaluated the Proposed Transaction and recommended its approval to the Board.  In connection with the Proposed Transaction, defendant Wilkinson entered into the Lock-Up Agreement with defendant Petroflow Sub, pursuant to which he agreed to vote his shares in favor of the Proposed Transaction and against any alternative proposals.  Defendant Wilkinson is a citizen of Canada.

19.     Defendant Lee Canaan ("Canaan") is an Equal Energy director and has been since May 2013.  In connection with the Proposed Transaction, defendant Canaan entered into the Lock-Up Agreement with defendant Petroflow Sub, pursuant to which

she agreed to vote her shares in favor of the Proposed Transaction and against any alternative proposals. Defendant Canaan is a citizen of Michigan.

20.     Defendant Michael Coffman ("Coffman") is an Equal Energy director and has been since May 2013. In connection with the Proposed Transaction, defendant Coffman entered into the Lock-Up Agreement with defendant Petroflow Sub, pursuant to which he agreed to vote his shares in favor of the Proposed Transaction and against any alternative proposals. Defendant Coffman is a citizen of Oklahoma.

21.     Defendant Kyle Travis ("Travis") is an Equal Energy director and has been since May 2013. In connection with the Proposed Transaction, defendant Travis entered into the Lock-Up Agreement with defendant Petroflow Sub, pursuant to which he agreed to vote his shares in favor of the Proposed Transaction and against any alternative proposals. Defendant Travis is a citizen of Oklahoma.

22.     Defendant Petroflow is a Delaware corporation with principal executive offices located at 525 S. Main, Suite 1120, Tulsa, Oklahoma. Accordingly, defendant Petroflow is a citizen of both Delaware and Oklahoma. Defendant Petroflow, a wholly-owned subsidiary of TexOak Petro Holdings LLC ("TexOak Petro"), is an oil and natural gas company involved in the exploration, development, and production of oil and natural gas in Oklahoma, Texas, Kansas, and Illinois.

23.     Defendant Petroflow Sub is an Alberta, Canada, corporation and a wholly-owned subsidiary of defendant Petroflow. Defendant Petroflow Sub's head office is located at 525 S. Main Street, Suite 1120, Tulsa Oklahoma. Accordingly, defendant Petroflow Sub is a citizen of both Canada and Oklahoma. Upon completion of the

Proposed Transaction, defendant Petroflow Sub will acquire all of the shares of defendant Equal Energy.

## INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

24.     Under Canadian law, the Individual Defendants, as directors of Equal Energy are required to: (i) act honestly and in good faith with a view to the best interests of the corporation; and (ii) to exercise the care, diligence, and skill that a reasonably prudent person would exercise in comparable circumstances.

25.     Moreover, in any situation where the directors of a corporation undertake a transaction where it is apparent there will be a sale of equity and/or voting control, directors and officers are required to take active and reasonable steps to maximize shareholder value.  To diligently comply with these duties and ensure the shareholders receive a significant premium, the directors and officers may not take any action that:

(a)     adversely affects the value provided to the corporation's shareholders;

(b)     will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

(c)     contractually prohibits them from complying with their fiduciary duties;

(d)     will otherwise adversely affect their duty to search and secure the best value reasonably available under the circumstances for the corporation's shareholders; and

(e)    will provide the directors and/or officers with preferential treatment at the expense of, or separate from, the public shareholders.

26.    In addition, the Individual Defendants, as directors of Equal Energy, are obligated under Canadian law to:

(a)    refrain from engaging in acts or omissions in a manner that is oppressive or unfairly prejudicial to the interests of shareholders;

(b)    ensure that proper mechanisms are in place when participating in any transaction where the directors' or officers' loyalties are divided so that shareholders are treated fairly;

(c)    provide shareholders with enough information to make a reasoned judgment about the issues presented to them;

(d)    refrain from participating in any transaction where the directors or officers receive, or are entitled to receive, a personal financial benefit not equally shared by the public shareholders of the corporation;

(e)    refrain from unjustly enriching themselves at the expense or to the detriment of the public shareholders; and

(f)    refrain from unjustly entrenching themselves as managers and/or officers of the Company by failing to give adequate consideration to legitimate bids for the Company.

27.    The Individual Defendants, separately and together, in connection with the Proposed Transaction, are knowingly or recklessly violating their fiduciary duties and

aiding and abetting such breaches, including their duties of care, loyalty, good faith, and independence owed to plaintiff and other public shareholders of Equal Energy.

28.     The Individual Defendants, separately and together, have violated and are continuing to violate the reasonable expectation of the Company's shareholders by oppressive, unfairly prejudicial conduct insofar as they have deprived plaintiff and the Class (as defined herein) of their reasonable expectation to receive fair value for their shares of Equal Energy.

**THE UNFAIR PROCESS LEADING UP TO THE PROPOSED TRANSACTION**

29.     Following on the heels of the Company's $116 million asset sale in 2012, an entity identified in the Proxy as "Company A" proposed a potential business combination to Equal Energy on January 31, 2013.  Shortly thereafter, on February 11, 2013, the Company rejected Company A's proposal.  The Proxy is silent as to the details of Company A's January 31, 2013 proposal.

30.     On March 25, 2013, Montclair, one of the Company's largest shareholders, announced that it had made a proposal to acquire Equal Energy on February 27, 2013, for $4 per share.  In response to this announcement, the Company announced that it had purportedly formed a Special Committee in early March 2013 to evaluate Montclair's proposal and any other proposal to acquire Equal Energy.  Moreover, the Company also announced that it retained GHS and Scotiabank to evaluate any such proposals.

31.     Over the next few days, the Company received indications of interest from six other parties concerning potential transactions and business combinations.  In addition, on April 1, 2013, Company A presented Equal Energy with a revised proposal.

The Proxy is silent as to the individual indications of value from each of the six other parties that approached Equal Energy.

32.     On April 9, 2013, the Company established a virtual data room and provided access to several interested parties who agreed to enter a confidentiality agreement.  Despite being contacted by Equal Energy about a potential transaction, Petroflow indicated that it was not interested in acquiring the Company and failed to execute a confidentiality agreement.

33.     On April 23, 2013, Company A provided yet another revised proposal to Equal Energy and requested to make a presentation to the Special Committee to outline the merits of its proposal.  The Board rejected Company A's revised proposal and its offer to make a presentation.  The Proxy is silent as to the terms of the revised offer made by Company A on April 23, 2013, and the basis for the Board determining that the offer was "unacceptable."  Moreover, the Proxy does not explain why Equal Energy's management and GHS chose not to accept Company A's offer to make a presentation.

34.     On May 1, 2013, another entity identified in the Proxy as "Company B," provided Equal Energy with a proposal.  According to the Proxy, certain aspects of Company B's proposal "were compelling."  However, Equal Energy decided that certain other aspects of Company B's proposal were "not acceptable" and as such, began working on a counter-proposal. Equal Energy sent this counter-proposal to Company B on May 27, 2013.  In response, Company B proposed a few revisions to the otherwise "acceptable" counter-proposal.  The Proxy fails to disclose the terms of the offer made by

Company B on May 1, 2013, the "certain aspects" that were not acceptable and those that were "compelling," and the value of the counter-proposal presented to Company B.

35.     After several discussions between Equal Energy and Company B, Company B increased its proposal to $5 per Equal Energy share.  On June 14, 2013, Equal Energy accepted this revised proposal and promised to negotiate exclusively with Company B for forty-five days.  Shortly thereafter, on June 26, 2013, Equal Energy revoked access to the virtual data room to all other parties that expressed interest in acquiring the Company.

36.     Equal Energy terminated discussions with Company B on August 20, 2013, due to Company B's purported failure to make "significant progress … in regards to executing a transaction with Equal."  That same day, on August 20, 2013, Equal Energy rejected a revised proposal it had received from Montclair to acquire the Company for $4.75 per share.

37.     On August 21, 2013, the financial advisor for Petroflow contacted GHS indicating that notwithstanding Petroflow's lack of interest in April 2013, Petroflow was now interested in negotiating a confidentiality agreement so that it could gain access to the virtual data room and potentially make a proposal.

38.     On September 6, 2013, Equal Energy received non-binding proposals from Montclair and Petroflow.  The Montclair offer indicated a price of $4.85 per Equal Energy share, but acknowledged that there was potential to substantially increase the bid based on the fact that Equal Energy had recently published new information in regards to the valuation of its oil and gas reserves.  Petroflow's proposal indicated a price of $5.25 per Equal Energy share.

39.    In the next few weeks, Equal Energy provided Montclair and Petroflow with access to the virtual data room.  In addition, Equal Energy's management and GHS gave a presentation to Petroflow management and its financial advisors, which purportedly "allowed Petroflow to verify diligence information and largely conclude its diligence."  The Proxy is silent as to why Equal Energy did not give the same or comparable presentation to Montclair.

40.    On September 29, 2013, Equal Energy received revised proposals from Montclair and Petroflow.  Notwithstanding the fact that Petroflow received additional diligence information from Equal Energy's presentation, Petroflow did not increase its previous offer price of $5.25 per Equal Energy share.  Montclair, on the other hand, increased its previous offer and matched Petroflow's offer of $5.25 per Equal Energy share.

41.    On October 1, 2013, GHS informed Montclair and Petroflow that they had until October 3, 2013, to increase their bids because they were tied with another undisclosed bidder.  On October 3, 2013, Equal Energy received revised proposals from Montclair and Petroflow.  Whereas Montclair increased its offer to $5.40 per Equal Energy share, Petroflow increased its offer slightly higher to $5.43 per Equal Energy share.

42.    The Board met on the evening of October 3, 2013, to review the revised offers and determined that notwithstanding a few proposed revisions, Petroflow's offer was "acceptable."  Instead of seeking a higher offer from Montclair given how close it was to Petroflow's offer, the Board instructed GHS to inform Montclair that it was not the

successful bidder.  Petroflow agreed to Equal Energy's proposed revisions over the next two days.  The Proxy is silent as to the revisions the Board proposed to accept Petroflow's offer.  On October 6, 2013, Petroflow and Equal Energy executed the final letter of intent and entered into a sixty day exclusivity period to work towards the execution of a definitive agreement and to allow Petroflow to conduct further due diligence.

43.     Over the next two months, Equal Energy, Petroflow, and their legal and financial advisors communicated on a number of structural and documentation points and finalized the definitive Arrangement Agreement and Lock-Up Agreement.

44.     On November 18, 2013, Equal Energy disseminated a press release indicating that it was engaged in exclusive negotiations with a particular party and that the exclusive negotiation and diligence period would run into early December.

45.     On December 6, 2013, the Special Committee met with Equal Energy's management, GHS, and Equal Energy's legal advisors to discuss the final terms of the definitive agreement.  At this meeting, GHS rendered its "Fairness Opinion."  That same day, Montclair issued a press release discussing its concerns about Equal Energy's strategic process.  In particular, Montclair stated that the Company's current strategic process is not being effectively conducted and could fail to maximize shareholder value.  The Proxy is silent as to the Board's assessment of Montclair's concerns.  Equal Energy appeared to completely ignore Montclair's concerns and publicly announced the Proposed Transaction in a press release on December 9, 2013.

## THE PROPOSED TRANSACTION

46.    On December 9, 2013, Equal Energy issued the following press release announcing that the Company had entered into an agreement to be acquired by defendant Petroflow for $5.43 per Company share.   The press release announcing the Proposed Transaction stated, in pertinent part:

Equal Energy Enters Definitive Agreement to be Acquired by Petroflow Energy

Dec 9, 2013.

OKLAHOMA CITY, Dec. 9, 2013 /CNW/ - Equal Energy Ltd. ("Equal" or the "Company") (NYSE: EQU) (TSX: EQU) is pleased to announce that the Company has entered into a definitive agreement ("Arrangement Agreement") with Petroflow Energy Corporation and Petroflow Canada Acquisition Corp. (collectively defined as "Petroflow") for the cash purchase of all of the issued and outstanding common shares of Equal at a price of US$5.43 per share, on a fully-diluted basis. The total transaction value, including net debt and transaction costs, is approximately US$230 million. The transaction received unanimous approval by Equal's board of directors and will be completed by way of a plan of arrangement under the Business Corporations Act (Alberta) (the "Arrangement").

* * *

Equal's board of directors, with input from the Company's advisors and management team, unanimously determined that the Arrangement with Petroflow is in the best interest of the Company's shareholders. In light of this determination, the Board has resolved to recommend that its shareholders vote their shares in favor of the Arrangement. All members of management of the Company and its board of directors have indicated their intention to vote their shares in favor of the Arrangement.

The Arrangement must be approved by a vote of 66 2/3% of the votes cast by shareholders at a special meeting.

As per the Arrangement Agreement and subject to certain fiduciary exceptions, the Company has agreed that it will not solicit or initiate discussions with respect to any other business combination or sale of

material assets. In the Arrangement Agreement, Equal also made customary representations, warranties and covenants to Petroflow.

Pursuant to the Arrangement Agreement, a termination fee of US$2 million will be payable by the Company in certain circumstances. These circumstances include if the Company terminates the Arrangement Agreement to enter into an agreement with a party other than Petroflow, in response to a superior proposal, or if the board of directors of the Company withdraws or modifies its recommendation in favor of the Arrangement with Petroflow. Alternatively, a termination fee of US$2 million will be payable to the Company if Petroflow is unable to complete the Arrangement.

47.     That next day, on December 10, 2013, Equal Energy filed a DEFA14A and Form 8-K with the SEC, wherein it disclosed the Arrangement Agreement.   The Arrangement Agreement reveals that the Proposed Transaction is the product of a flawed sales process and, unless the offer price is increased, would be consummated at an unfair price.  The Arrangement Agreement also reveals that the Individual Defendants agreed to numerous deal protection devices designed to preclude any competing bids for Equal Energy.  For example, Equal Energy is subject to a no-solicitation clause that prohibits the Company from seeking a superior offer for its shareholders.   Specifically, section 6.1(a) of the Arrangement Agreement states, in pertinent part:

**6.1 Non-Solicitation**

(a) Except as otherwise provided in this Article 6, the Company shall not, directly or indirectly through any Representative of the Company, and shall cause each of its Subsidiaries not to, directly or indirectly through any Representative:

(i) make, solicit, assist, encourage, initiate, promote or otherwise facilitate (including by way of furnishing non-public information, permitting any visit to any facilities or properties of the Company or any of its Subsidiaries or entering into any form of written or oral agreement, arrangement or understanding) any inquiries, proposals, offers or expressions of interest regarding or constituting any

Acquisition Proposal or which could reasonably be expected to lead to an Acquisition Proposal;

(ii) encourage or engage in any discussions or negotiations (other than with the Parent, the Acquiror or any of their respective Representatives) regarding, or provide any information with respect to, any Acquisition Proposal or potential Acquisition Proposal;

48.     Though the Arrangement Agreement ostensibly has a "fiduciary out" provision that allows the Company to negotiate with other bidders, this provision would require a potential acquirer to first make an unsolicited offer.  Without access to non-public information, which the Company is prevented from offering under the Arrangement Agreement, no other bidders will emerge to make a superior proposal.

49.     Furthermore, in the unlikely event that an unsolicited bidder arrives on the scene, the Company must notify Petroflow of the bidder's offer.  Thereafter, should the Board determine that the unsolicited offer is superior, Petroflow is granted five business days to amend the terms of the Arrangement Agreement to make a counter offer that only needs to be as favorable to the Company's shareholders as the unsolicited offer. Petroflow will be able to match the unsolicited offer because it is granted unfettered access to the unsolicited offer, in its entirety, eliminating any leverage that the Company would have in receiving the unsolicited offer.

50.     Also, pursuant to section 10.2(a) of the Arrangement Agreement, Equal Energy must pay Petroflow a $2 million termination fee if it accepts a superior proposal. This additional consideration would be paid directly to Petroflow rather than Equal Energy shareholders, thereby making it even more difficult for any competing bidder to acquire the Company.

51.    In addition to the above, the Company and Petroflow entered into the Lock-Up Agreement with the directors and officers of Equal Energy covering a total of **693,065** common shares.  Under the Lock-Up Agreement, the directors and officers of Equal Energy agreed, among other things, to vote their Equal Energy holdings: (i) in favor of approving the Proposed Transaction; and (ii) against any alternative proposals to acquire Equal Energy.  As such, any potential competing bidder will necessarily have the vote stacked against it, thus further precluding the possibility of Equal Energy receiving a competing bid.

52.    These onerous and preclusive deal protection devices operate in conjunction to discourage competing offers from emerging for the Company, ensuring that the unfair transaction is consummated so that the Individual Defendants can secure their own personal benefits under the Proposed Transaction.  Accordingly, the Individual Defendants' efforts to put their own personal interests before that of the Company's shareholders have resulted in a Proposed Transaction presented to Equal Energy shareholders at an untenable and inadequate offer price.

## THE PROPOSED CONSIDERATION IS UNFAIR

53.    The Individual Defendants' fiduciary duties require them to maximize shareholder value when entering into a change-in-control transaction such as the Proposed Transaction.  Here, however, the Individual Defendants' eagerness to enter into an acquisition with Petroflow resulted in a sales process that was not designed to obtain the maximum price for Equal Energy shareholders.  As a result, the Company's public stockholders have been, and will continue to be, denied the fair process and arm's-length

negotiated terms to which they are entitled in a sale of their Company.   Indeed, the Proposed Consideration does not reflect the true inherent value of the Company as known to the Individual Defendants and Petroflow at the time the Proposed Transaction was announced.

54.     The Proposed Transaction price of $5.43 per share drastically undervalues the Company.   The transaction will result in little to no premium for Equal Energy shareholders, as Equal Energy stock has traded above the sale price at $5.72 per share as recently as December 6, 2013.  Moreover, in the last three years, Equal Energy has traded as high as *$8.51* on April 6, 2011.

**Equal Energy's Strong Business Prospects**

55.     The inadequacy of the Proposed Consideration is evidenced by the Company's strong business prospects and lucrative assets.   Equal Energy's oil and gas assets are centered on the highly economic, liquids-rich window of the Hunton dolomite play in Central Oklahoma, where the Company currently holds 9,000 net undeveloped acres.  During the third quarter of 2013, Equal Energy drilled three Hunton wells with a *100%* success rate.

56.     The inadequacy of the Proposed Consideration is further demonstrated by the Company's recent financial performance.   On November 7, 2013, the Company announced its financial and operational results for its third quarter of 2013, ended September 30, 2013.  Equal Energy's revenues for the third quarter of 2013 totaled $16.6 million, up *40%* from $11.9 million a year earlier.   Commenting on these results, defendant Klapko, Equal Energy's President and CEO stated, "'Our drilling continues to

deliver higher than budgeted reserves and production at an attractive cost.... Having averaged over 6,700 barrels for the third quarter, we are confident we will exceed our target production of 6,400 [barrel of oil equivalent per day] on average for the full year 2013."

57.    Moreover, the Proposed Consideration does not adequately value the strategic opportunity that Equal Energy represents, particularly in light of its lucrative and valuable propane assets. Accounting for 56% of the revenues in the second quarter of 2013, despite being only 25% of volumes, propane is a key forecasting consideration for Equal Energy.   According to the U.S. Department of Energy's storage statistics, at no time in the last decade have propane inventories been as low as they are now. Although propane pricing has improved significantly, prices are still well below historic levels.

**At Least One Analyst Has Set a Higher Target for Equal Energy**

58.    Less than a month before the announcement of the Proposed Transaction, on November 19, 2013, Alistair Toward, an analyst at PI Financial Corp., set a $6.68 price target for the Company.  Moreover, Mr. Toward's target price for Equal was at least $0.40 higher than the Proposed Consideration for the ten months preceding the announcement of the Proposed Transaction.

**Recent Comparably-Sized Deals for Similar Companies Provided Significantly Greater Premiums**

59.    When compared to similar transactions, the Proposed Consideration for Equal Energy is woefully inadequate.  In the past five years, there have been fifteen comparably-sized deals in the oil and gas exploration and production industry in the

$100 million to $2 billion range.   On average, these deals have carried a one-day premium of nearly *18%*, over *sixteen* times the 1.1% one-day premium offered in the Proposed Transaction.   Similarly, on average, these deals have carried a one-week premium of over *23%*, almost *four* times the 6.3% one-week premium offered in the Proposed Transaction.

**Several of the Company's Largest Shareholders Have Reacted Negatively to the Proposed Transaction**

60.   The inadequacy of the Proposed Transaction and unfairness of the Proposed Consideration has sparked opposition from some of the Company's largest shareholders, including, but not limited to, Montclair and Lawndale.  Montclair, whose principals hold approximately 5% of Equal Energy's common shares, previously attempted to take the Company private.   Montclair has publicly and negatively commented on the process undertaken by the Board in selling the Company.  Montclair is concerned that the Company's current strategic process is not being effectively conducted and could fail to maximize shareholder value.  A December 6, 2013 press release issued by Montclair stated, in pertinent part:

**Concerned shareholder of Equal Energy Ltd. calls on Board to maximize shareholder value**

*... Montclair Energy, LLC ("Montclair") today expressed its concerns about the ongoing strategic process being conducted by the Board* of Directors of Equal Energy Ltd. ("Equal Energy" or the "Company").

Montclair first expressed an interest in acquiring Equal Energy in February, 2013.  Montclair's expression of interest followed the conclusion of the strategic review process carried out by the Equal Energy Board in 2012 that had failed to result in a sale transaction for the Company. Collectively, the principals of Montclair are the Company's largest shareholder and most of

the Company's assets in the Hunton formation of Oklahoma (which constitute the principal assets of the Company) were initially explored, owned and operated by Montclair's principals. Following the conclusion of the 2012 strategic review, Montclair recognized that existing management was not effectively operating the Company's assets and that there was considerable room for the creation of value by taking the Company private. These efforts to acquire the Company, were rejected by the Board. On November 18, 2013, the Company announced that its Board continues to carry out a strategic review process that was initiated following Montclair's offer to acquire the Company and that it is in exclusive negotiations with a party that has made a proposal. The Company has yet to provide any details about a proposed transaction.

> *Montclair is concerned that the Company's current strategic process is not being effectively conducted, and, like the strategic review conducted in 2012, could fail to maximize shareholder value or even fail to result in presentation of a transaction to shareholders for consideration.* Montclair notes that although the Company's share price has risen since Montclair initially expressed its interest, these gains have largely been fueled by shareholder anticipation of an acquisition transaction rather than renewed confidence in management.

61.     Similarly, on December 10, 2013, Lawndale, also owning just under 5% of Equal Energy's outstanding shares, issued a press release expressing its concern over the Proposed Transaction and the inadequacy of the Proposed Consideration.   Lawndale's press release stated, in pertinent part:

> Lawndale feels a synergistic buyer should be able to easily grow Equal's cash flow. This higher cash flow should safely support modest increased borrowings that could fund a sizable stock buyback, a higher sustainable dividend on the lower share count and still be able to support substantial production and reserves growth. *The resulting distribution combined with the remaining higher yielding Equal shares should combine in value to more than Petroflow's $5.43/share.*

> Lawndale's analysis notes *that the proposed transaction is all-cash, squeezing out public shareholders from all benefits of Equal's future growth and value creation from its vast and valuable reserves and growing production streams.* Lawndale also notes that Petro flow is a former operating partner of Equal's Oklahoma assets and the Company's

current management. When such *dangerous combinations* occur Lawndale's policy is to request more thorough disclosure and apply greater scrutiny of the alternatives process for any value being transferred from Equal Energy shareholders to the buying group for which shareholders are not being compensated.

Equal's December 9 press release emphasizes the "fairness" of the transaction price and *no longer discusses the company's bright economic prospects in light of substantial increases in industry propane prices and export capacity and Equal's own reserves and production outlook.*

62.     Less than a week later, on December 16, 2013, Montclair issued another press release criticizing the Proposed Transaction and inadequate Proposed Consideration. Montclair's press release stated, in pertinent part:

> *Montclair and its principals view the PetroFlow transaction as wholly inadequate on numerous grounds, including value, the uncertainty of financing and process.* Montclair agrees with the analysis of Lawndale Capital Management in its December 10, 2013 press release which noted, with improved operational efficiency, the Company could afford increased borrowings to fund a sizable stock buyback and generate a higher sustainable dividend, creating more value for shareholders than the $5.43 per share proposed in the PetroFlow transaction.
>
> *   *   *
>
> Montclair notes the following deficiencies in the PetroFlow transaction:
>
> Undervaluing the Company: The price of US$5.43 would deprive shareholders of significant inherent value in their shares that could be realized through proper management. Montclair believes that the better alternative for Equal Energy shareholders is to replace the current board of directors and management of the Company with directors and managers who have proven records of operating in the Hunton formation profitably and efficiently and giving such directors a mandate to take the steps necessary with respect to the Company's balance sheet to enhance shareholder value. Such steps could include a substantial share buy-back that could be financed through modest increased borrowings and which would allow for a sustainable increase to the Company's dividend while still meeting the higher debt service payments.

Cancellation of Dividends: The Arrangement Agreement provides for the cancellation of all undeclared dividends prior to closing. This means that shareholders will not receive the value of the dividends that they would otherwise receive in the first and potentially second quarter of 2014, in effect subsidizing the acquisition cost for PetroFlow.

\* \* \*

Preclusive Exclusivity Provisions: The Arrangement Agreement unduly restricts Equal Energy from seeking superior offers. Such restrictions are inappropriate given the conditional nature of PetroFlow's obligations. Moreover, although PetroFlow would be able to walk from the transaction without penalty if it is unable to obtain the necessary financing, Equal Energy is required to pay a US$2 million break-up fee to PetroFlow if the Company accepts a better offer.

## INSIDERS REAP DISPROPORTIONATE BENEFITS FROM THE PROPOSED TRANSACTION

63.     By reason of their positions with Equal Energy, the Individual Defendants have access to non-public information concerning the financial condition and prospects of Equal Energy.  Thus, there exists an imbalance and disparity of knowledge and economic power between the Individual Defendants and the public shareholders of Equal Energy.  Therefore, it is inherently unfair for the Individual Defendants to execute and pursue any proposed agreement under which they will reap disproportionate benefits to the exclusion of obtaining the best value for shareholders.

64.     The Proposed Transaction is being driven by members of the Board and Company management's intent on receiving over *$22.7 million* from the sale of their illiquid Equal Energy holdings.  This interest is not shared by and, indeed is at odds with, the interests of the rest of the Company's public shareholders.

65.     In addition to cashing in their otherwise illiquid shares, Equal Energy's officers and directors will receive millions of dollars in special payments for currently

unvested stock options, performance units, and restricted shares, all of which shall, upon the closing of the Proposed Transaction, become fully vested and exercisable. Defendant Klapko and other members of senior management are also entitled to receive millions of dollars in change-of-control payments. These benefits are not shared by the Company's non-insider public shareholders. Thus, the Individual Defendants are conflicted and serving their own financial interests rather than those of Equal Energy's other shareholders.

66.     The Proposed Transaction is wrongful, unfair, and harmful to Equal Energy's public stockholders, and represents an effort by the Individual Defendants to aggrandize their own financial position and interests at the expense of and to the detriment of the Class members. Specifically, defendants are attempting to deny plaintiff and the Class their shareholder rights through the sale of Equal Energy via an unfair process. Accordingly, the Proposed Transaction will benefit the Individual Defendants at the expense of Equal Energy shareholders.

67.     In order to meet their fiduciary duties, the Individual Defendants are obligated to explore transactions that will maximize shareholder value, and not structure a preferential deal for themselves. Due to the Individual Defendants' eagerness to enter into a transaction with Petroflow, they failed to implement a process to obtain the maximum price for Equal Energy shareholders.

68.     As a result of defendants' conduct, Equal Energy's public stockholders have been and will continue to be denied the fair process and arm's-length negotiated terms to which they are entitled in a sale of their Company. The consideration reflected

in the Arrangement Agreement does not reflect the true inherent value of the Company that was known only to the Individual Defendants, as directors and officers of Equal Energy, and Petroflow at the time the Proposed Transaction was announced.

69.    In light of the foregoing, the Individual Defendants must, as their fiduciary obligations require:

(a)    withdraw their consent to the merger of Equal Energy with Petroflow and allow the shares to trade freely without impediments such as the aforementioned no-solicitation, matching rights, and termination fee provisions;

(b)    act independently so that the interests of Equal Energy's public stockholders will be protected;

(c)    adequately ensure that no conflicts of interest exist between their own interests and their fiduciary obligation to maximize stockholder value or, if such conflicts exist, to ensure that all conflicts be resolved in the best interests of Equal Energy's public stockholders; and

(d)    solicit competing bids to Petroflow's offer without the impediments discussed above to ensure that the Company's shareholders are receiving the maximum value for their shares.

**THE MATERIALLY MISLEADING PROXY**

70.    In order to secure shareholder approval of this unfair deal, defendants filed with the SEC the Proxy on December 31, 2013. The Proxy misrepresents and/or omits material information necessary for Equal Energy's public shareholders to make an informed decision regarding whether to vote in favor of the Proposed Transaction in

violation of sections 14a and 20a of the Exchange Act. Specifically, as set forth below, defendants fail to provide the Company's shareholders with material information and/or provide them with materially misleading information concerning: (i) the process leading up to the announcement of the Proposed Transaction; (ii) the financial analyses supporting the Proposed Consideration performed by GHS, the Board's financial advisor; (iii) conflicts of interest affecting GHS; and (iv) the Company's financial projections.

**The Sales Process Leading to the Proposed Transaction**

71.     With respect to the process that led to the Proposed Transaction, the Proxy is materially deficient and misleading because it fails to disclose:

(a)     the details of the proposal received by Company A on January 31, 2013;

(b)     the individual indications of value from each of the six other parties that approached Equal Energy;

(c)     the terms of the revised offer made by Company A on April 23, 2013, and the basis for determining that the offer was "unacceptable";

(d)     why Equal Energy's management and GHS chose not to accept Company A's offer to make a presentation;

(e)     the terms of the offer made by Company B on May 1, 2013 and the "certain aspects" that were not acceptable and those that were "compelling";

(f)     the value of the counter-proposal presented to Company B;

(g)     what reason did Equal Energy's Management and GHS have for

making a presentation only to Petroflow and not to any of the other bidders;

      (h)    the revisions the Board required to accept Petroflow's offer; and

      (i)    the Board's assessment of the concerns Montclair brought up in its

December 6, 2013 press release.

    72.    The omission of this information makes the following statements in the

Proxy materially misleading:

      (a)    on page 33 of the Proxy, the statement:

On January 31, 2013, Equal received a proposal from an interested party ("Company A") relating to a potential business combination. The Board and management of Equal reviewed the proposal and decided that it was inadequate and, as such, on February 11, 2013, Equal indicated to Company A that it was not interested in pursuing further negotiations.

      (b)    on pages 34-35 of the Proxy, the statement:

Following the public nature of the announcement by Montclair, Equal received increased interest from a number of parties and between March 26 and March 27, 2013, engaged in discussions with Montclair and its advisors as well as six other parties that had approached Equal and expressed interest about potential transactions and/or business combinations.

\*    \*    \*

On April 23, 2013, Equal received a revised non-binding proposal from Company A. Company A requested to make a presentation to the Special Committee, GHS and Equal management to outline the merits of its proposal. After review by the Special Committee, Equal management and GHS, Equal's Board decided that the proposal remained unacceptable in its current form. Equal communicated this to representatives from Company A and indicated that representatives from Equal were not prepared to meet until a more reasonable proposal was put forward.

On May 1, 2013, Equal received an indication of interest from one of the party's involved in the process ("Company B"). The Special Committee met on May 7, 2013 to further discuss the proposal from Company B and assess various financial modelling scenarios that were prepared by GHS. The Special Committee, after discussing the matter with Equal management and

GHS decided that while the proposal from Company B had certain aspects that were not acceptable to Equal there were certain aspects of such proposal that were compelling. Following the meeting, GHS indicated to the financial advisors for Company B that Equal and its representatives were working on a counter-proposal. GHS and Equal management conducted extensive financial modelling and due diligence on potential transaction structures with Company B over the next three weeks and maintained a constant dialogue with representatives from Company B.

On May 27, 2013, the Special Committee met with Equal management, GHS and its legal advisors to discuss the counter-proposal and get an update on other parties involved in the strategic process. Following extensive discussion among the attendees in that meeting the Special Committee approved a counter-proposal to be presented to Company B. Equal forwarded a counter-proposal to representatives from Company B later on May 27, 2013. Representatives from Company B responded on May 28, 2013 and noted that a number of the changes proposed in the counter-proposal from Equal were acceptable, but there were some aspects of the counter-proposal that needed to be revised to be acceptable to Company B. On May 28, 2013, Company B provided two further alternatives to the counter-proposal and asked Equal to respond as soon as possible. Between May 28 and May 31, GHS held numerous teleconferences with the financial advisors of Company B to clarify certain aspects of the two options in the revised proposal presented by Company B. GHS worked on revising the financial models in relation to the options outlined in the revised proposal as well as various other go-forward scenarios for Equal.

    (c)    on page 37 of the Proxy, the statement:

On September 24, 2013, Equal management and GHS gave a presentation to Petroflow management and its financial advisors which allowed Petroflow to verify diligence information and largely conclude its diligence.

* * *

On October 4, 2013, GHS advised Montclair that it was not the successful bidder. GHS also discussed with Petroflow potential revisions to its proposal. Petroflow agreed to certain revisions and submitted a slightly revised offer. On the evening of October 4, 2013, the Board met with Equal management, GHS and Equal's legal advisors to discuss the revised proposal from Petroflow. The Board approved the revised offer, subject to some minor revisions being made.

(d)   on page 39 of the Proxy, the statement:

On November 26, 2013, the financial and legal advisors for each of Petroflow and Equal held a conference call to discuss outstanding legal and business points. The attendees settled the majority of outstanding points, but they noted that there were a few remaining business points and tax diligence by [Ernst & Young LLP] was not fully complete.

On November 27, 2013, Equal's legal advisors provided Petroflow's legal counsel with a draft of the extensive disclosure letter for review by Petroflow and its advisors.

(e)   on page 40 of the Proxy, the statement:

On December 3, 2013, Petroflow's legal counsel advised Equal's legal counsel that it had accepted the comments from Equal's legal counsel on both the form of Lock-Up Agreement and the form of Option Cancellation Agreement and that such documents were in final form. Legal counsel for both of the parties also held a conference call to discuss the drafting of certain provisions in the definitive agreement and ensure they accurately reflected the business deal. Also, on such date, Mr. Klapko and the Chief Executive Officer of Petroflow had a telephone discussion to address certain operational matters and working capital requirements.

On December 4, 2013, Mr. Klapko and the Chief Executive Officer of Petroflow had further telephone discussions to address certain operational matters and working capital requirements.

(f)   on page 40 of the Proxy, the statement:

**Recommendation of the Special Committee**

The Special Committee, having undertaken a thorough review of, and carefully considered, the proposed Arrangement and the alternatives available to Equal, and having taken into account such other matters as it considered relevant (as described below under the heading "*Reasons for the Recommendation of the Board and Special Committee*"), unanimously determined that the Arrangement is advisable, in the best interests of Equal and that the consideration to be received pursuant to the Arrangement by Equal Shareholders is fair, from a financial point of view. Accordingly, the Special Committee unanimously approved the Arrangement and the Compensation Proposal and recommended that the Board approve the Arrangement and Compensation Proposal and recommended that the Equal Shareholders vote "FOR" the Arrangement Resolution and "FOR" the

Compensation Proposal.

(g) on page 41 of the Proxy, the statement:

**Recommendation of our Board of Directors**

After careful consideration, and taking into account the recommendation of the Special Committee and all of the factors described below, the Board unanimously determined that the Arrangement is advisable, in the best interests of Equal and that the consideration to be received pursuant to the Arrangement by Equal Shareholders is fair, from a financial point of view, and authorized and approved the Arrangement and the Arrangement Agreement and the other transactions contemplated by the Arrangement Agreement, and the Board unanimously recommends that the Equal Shareholders vote "FOR" the approval of the Arrangement Resolution, the complete text of which is attached as Appendix C to this Circular.

The Board also unanimously recommends that Equal Shareholders vote "FOR" the Compensation Proposal.

73. These statements are rendered misleading by the omissions because they give a materially incomplete and distorted picture of the sales process. The Proxy fails to disclose critical information relating to the process by which Equal Energy's management and the Board decided to pursue a strategic transaction. Each of the following omissions is material to shareholders because their omission does not permit shareholders to determine whether the Board and management adequately represented shareholders' interests during the negotiations process.

**GHS's Financial Analyses**

74. **GHS's Selected Public Companies Analysis.** The description of GHS's Public Companies Analysis on pages 45-46 of the Proxy is materially deficient and misleading because it fails to disclose:

(a) whether GHS performed any form of benchmarking analysis for

Equal Energy in relation to its selected comparable public companies; and

      (b)    the following multiples for each of the selected comparable companies observed by GHS in its analysis:

      (i)    total enterprise value ("TEV") to projected earnings before interest, taxes, depreciation, and amortization ("EBITDA") for fiscal year ("FY") 2013;

      (ii)    TEV to projected EBITDA FY 2014; and

      (iii)    TEV to most recently reported present value of estimated future oil and gas reserves, net of estimated direct expenses, discounted at an annual discount rate of 10% ("PV-10").

    75.    The omission of this information renders the following statement in the Proxy materially misleading:

      (a)    on pages 40 of the Proxy, the statement:

**Recommendation of the Special Committee**

The Special Committee, having undertaken a thorough review of, and carefully considered, the proposed Arrangement and the alternatives available to Equal, and having taken into account such other matters as it considered relevant (as described below under the heading "*Reasons for the Recommendation of the Board and Special Committee*"), unanimously determined that the Arrangement is advisable, in the best interests of Equal and that the consideration to be received pursuant to the Arrangement by Equal Shareholders is fair, from a financial point of view. Accordingly, the Special Committee unanimously approved the Arrangement and the Compensation Proposal and recommended that the Board approve the Arrangement and Compensation Proposal and recommended that the Equal Shareholders vote "FOR" the Arrangement Resolution and "FOR" the Compensation Proposal.

      (b)    on page 41 of the Proxy, the statement:

**Recommendation of our Board of Directors**

After careful consideration, and taking into account the recommendation of the Special Committee and all of the factors described below, the Board unanimously determined that the Arrangement is advisable, in the best interests of Equal and that the consideration to be received pursuant to the Arrangement by Equal Shareholders is fair, from a financial point of view, and authorized and approved the Arrangement and the Arrangement Agreement and the other transactions contemplated by the Arrangement Agreement, and the Board unanimously recommends that the Equal Shareholders vote "FOR" the approval of the Arrangement Resolution, the complete text of which is attached as Appendix C to this Circular.

The Board also unanimously recommends that Equal Shareholders vote "FOR" the Compensation Proposal.

      (c)    on page 44 of the Proxy, the statement:

On December 6, 2013, GHS rendered its oral opinion to our Board (which was subsequently confirmed in writing by delivery of its final written Fairness Opinion dated as of the same date) to the effect that, as of December 6, 2013, and based upon and subject to the various assumptions and limitations set forth therein, the consideration of USD$5.43 per share in cash to be received by the Equal Shareholders (other than those referenced above) in the Arrangement was fair, from a financial point of view, to such Equal Shareholders. The oral opinion and final written opinion delivered to Equal's Board were reviewed, discussed and approved by the fairness committee of GHS in accordance with GHS' customary practices prior to delivery.

      (d)    on pages 45-47 of the Proxy, the statement:

*Selected Public Companies Analysis*

GHS reviewed selected historical financial data and reserve and production data of Equal for September 9, 2013 and compared them to corresponding historical financial data and reserve and production data for small market cap public companies engaged in exploration and production activities which GHS believed were comparable to Equal's financial profile. GHS selected companies, excluding royalty trusts, predominately operating in the exploration and production sector in the continental United States, based on information obtained by searching SEC filings, public company disclosures, press releases, industry and popular press reports, databases, professional judgment and other sources, and by applying the following

general criteria:

- Regularly trading on an exchange and having market capitalization greater than USD$100 million and less than USD$400 million;

- Total enterprise value ("TEV") greater than USD$100 million and less than USD$700 million;

- Profitability (primarily measured by latest twelve months' ("LTM") earnings before interest, taxes, depreciation, depletion, amortization and certain other non-cash or unusual items ("EBITDA") divided by LTM net revenues ("Revenue")) in excess of 35%; and

- Leverage (primarily measured by net debt divided by LTM EBITDA) greater than 0.5x and less than 5.0x.

Based on these criteria, GHS identified and analyzed the following selected companies:

- Abraxas Petroleum Corp.

- Callon Petroleum Company

- Epsilon Energy Ltd. (Canada)

- Gastar Exploration, Inc.

- New Source Energy Partners L.P.

- PrimeEnergy Corp.

- PetroQuest Energy Inc.

- Warren Resources Inc.

For the selected public companies analysis, GHS compared TEV and projected implied enterprise valuation for calendar years ending 2013 and 2014 ("FY 2013" and "FY 2014", respectively) multiples for Equal derived from per Equal Share Arrangement Consideration and Equal's corresponding projected EBITDA and PV-10, on the one hand, to implied enterprise valuation multiples for the selected public companies derived from their closing prices per share on December 6, 2013 and corresponding EBITDA and PV-10, on the other hand.

The analysis indicated the following multiples:

| | Equal(1) | Equal(l) | Selected Public Companies(y) | | | |
|---|---|---|---|---|---|---|
| | | | High | Mean | Median | Low |
| TEV to Projected EBITDA FY 2013 | 7.1x | 6.2x | 9.6x | 6.0x | 5.4x | 4.0x |
| TEV to Projected EBITDA FY 2014 | 5.2 | 5.1 | 6.3 | 4.8 | 4.8 | 3.6 |
| TEV to Most Recently Reported PV-10 | 1.2 | 1.2 | 1.6 | 1.3 | 1.3 | 0.6 |

\*   \*   \*

The selected public company analysis showed that, based on the estimates and assumptions used in the analysis, the implied enterprise valuation multiples of Equal based on the per share Arrangement Consideration were within the range of or exceeded implied enterprise valuation multiples of the selected public companies.

76.    **DHS's Selected Asset Transaction Analysis**.  The description of DHS's Selected Asset Transaction Analysis on page 47 in the Proxy is materially deficient because it fails to disclose:

(a)    the individual transactions and the transaction dates reviewed by GHS in its analysis; and

(b)    the following metrics for each of the selected asset transactions observed by GHS in its analysis:

(i)    transaction value;

(ii)    proved reserves;

(iii)    USD$/ proved barrel of oil equivalent ("BOE");

(iv)    production 1,000 BOE per day ("MBOE/d");

(v)    USD$/ daily BOE; and

(vi)    percent of oil of proved reserves.

77.    The omission of this information renders the following statements in the

Proxy materially misleading:

(a)     on page 40 of the Proxy, the statement:

**Recommendation of the Special Committee**

The Special Committee, having undertaken a thorough review of, and carefully considered, the proposed Arrangement and the alternatives available to Equal, and having taken into account such other matters as it considered relevant (as described below under the heading "*Reasons for the Recommendation of the Board and Special Committee*"), unanimously determined that the Arrangement is advisable, in the best interests of Equal and that the consideration to be received pursuant to the Arrangement by Equal Shareholders is fair, from a financial point of view. Accordingly, the Special Committee unanimously approved the Arrangement and the Compensation Proposal and recommended that the Board approve the Arrangement and Compensation Proposal and recommended that the Equal Shareholders vote "FOR" the Arrangement Resolution and "FOR" the Compensation Proposal.

(b)     on page 41 of the Proxy, the statement:

**Recommendation of our Board of Directors**

After careful consideration, and taking into account the recommendation of the Special Committee and all of the factors described below, the Board unanimously determined that the Arrangement is advisable, in the best interests of Equal and that the consideration to be received pursuant to the Arrangement by Equal Shareholders is fair, from a financial point of view, and authorized and approved the Arrangement and the Arrangement Agreement and the other transactions contemplated by the Arrangement Agreement, and the Board unanimously recommends that the Equal Shareholders vote "FOR" the approval of the Arrangement Resolution, the complete text of which is attached as Appendix C to this Circular.

The Board also unanimously recommends that Equal Shareholders vote "FOR" the Compensation Proposal.

(c)     on page 44 of the Proxy, the statement:

On December 6, 2013, GHS rendered its oral opinion to our Board (which was subsequently confirmed in writing by delivery of its final written Fairness Opinion dated as of the same date) to the effect that, as of December 6, 2013, and based upon and subject to the various assumptions

and limitations set forth therein, the consideration of USD$5.43 per share in cash to be received by the Equal Shareholders (other than those referenced above) in the Arrangement was fair, from a financial point of view, to such Equal Shareholders. The oral opinion and final written opinion delivered to Equal's Board were reviewed, discussed and approved by the fairness committee of GHS in accordance with GHS' customary practices prior to delivery.

    (d)    on page 47 of the Proxy, the statement:

*Selected Asset Transaction Analysis*

GHS reviewed natural gas weighted domestic asset transactions which it believed were comparable to Equal's financial profile. GHS selected these transactions based on information obtained by searching SEC filings, public company disclosures, press releases, industry and popular press reports, databases, professional judgment and other sources and by applying the following criteria:

    1.    Production consisting of less than 50% oil;

    2.    Transactions announced after January 1, 2012; and

    3.    Transactions with the following data available:

        (a)    Transaction Value;

        (b)    Proved Reserves;

        (c)    $/Proved Reserves;

        (d)    Production; and

        (e)    $/Daily Boe

Based on these criteria, the 45 transactions were selected, resulting in the following statistics:

| | Transaction Value (USD$MM) | Proved Reserves (MMBOE) | USD$/Proved BOE (Adv. Est.) | Production (MBOE/d) | USD$/Daily BOE (Adv. Est.) | Proved Reserves (% Oil) |
|---|---|---|---|---|---|---|
| Min | 7.0 | 1.2 | 1.69 | 0.2 | 14,000 | 0% |
| Max | 7,150.0 | 664.4 | 22.06 | 146.7 | 83,071 | 58% |
| Mean | 385.8 | 43.6 | 8.60 | 8.7 | 38,920 | 15% |
| Median | 106.7 | 15.0 | 7.77 | 2.8 | 35,994 | 9% |

The selected asset transaction analysis showed that, based on the estimates and assumptions used in the analysis, the transactions had a mean

production value of USD$38,920 per daily BOE (median value of $35,944 per daily BOE) and mean proved reserves value of USD$8.60 per BOE (median value of USD$7.77 per BOE). The mean and median implied enterprise values of Equal, using its proved reserves of 24.7 MMBoe, as stated in the HAAS Petroleum Engineering Services, Inc. ("HAAS") mid-year reserves evaluation dated August 5, 2013 as of July 1, 2013 prepared in accordance with SEC guidelines (the "Reserves Evaluation"), and applying the selected transactions information above, are USD$212.4 million and USD$191.9 million respectively. The mean and median implied value of Equal, using its production, 6.7 MBoe/d as of September 30, 2013, and applying the selected transaction information above, is USD$261.2 million and USD$241.6 million respectively.

78.     **DHS's Implied Shareholder Rate of Return Analysis**. The description of DHS's Implied Shareholder Rate of Return Analysis on pages 47-48 in the Proxy is materially deficient because it fails to disclose:

(a)     the basis that GHS used for determining the percent of realized oil, realized natural gas liquid, and realized gas;

(b)     which of the eight scenarios set forth by GHS was seen as most realistic by Equal Energy management;

(c)     what metrics were discounted to present value in its analysis (e.g., free cash flow, unlevered free cash flow, etc.);

(d)     on what basis did GHS calculate a terminal net asset value ("NAV") per share for Equal Energy;

(e)     what were the capitalized general & administrative ("G&A") and net debt figures used to convert enterprise value to NAV; and

(f)     on what basis did GHS select 10-25% rates of return for its analysis.

79.     The omission of this information renders the following statements in the

Proxy materially misleading:

(a)     on page 40 of the Proxy, the statement:

**Recommendation of the Special Committee**

The Special Committee, having undertaken a thorough review of, and carefully considered, the proposed Arrangement and the alternatives available to Equal, and having taken into account such other matters as it considered relevant (as described below under the heading "*Reasons for the Recommendation of the Board and Special Committee*"), unanimously determined that the Arrangement is advisable, in the best interests of Equal and that the consideration to be received pursuant to the Arrangement by Equal Shareholders is fair, from a financial point of view. Accordingly, the Special Committee unanimously approved the Arrangement and the Compensation Proposal and recommended that the Board approve the Arrangement and Compensation Proposal and recommended that the Equal Shareholders vote "FOR" the Arrangement Resolution and "FOR" the Compensation Proposal.

(b)     on page 41 of the Proxy, the statement:

**Recommendation of our Board of Directors**

After careful consideration, and taking into account the recommendation of the Special Committee and all of the factors described below, the Board unanimously determined that the Arrangement is advisable, in the best interests of Equal and that the consideration to be received pursuant to the Arrangement by Equal Shareholders is fair, from a financial point of view, and authorized and approved the Arrangement and the Arrangement Agreement and the other transactions contemplated by the Arrangement Agreement, and the Board unanimously recommends that the Equal Shareholders vote "FOR" the approval of the Arrangement Resolution, the complete text of which is attached as Appendix C to this Circular.

The Board also unanimously recommends that Equal Shareholders vote "FOR" the Compensation Proposal.

(c)     on page 44 of the Proxy, the statement:

On December 6, 2013, GHS rendered its oral opinion to our Board (which was subsequently confirmed in writing by delivery of its final written Fairness Opinion dated as of the same date) to the effect that, as of December 6, 2013, and based upon and subject to the various assumptions

and limitations set forth therein, the consideration of USD$5.43 per share in cash to be received by the Equal Shareholders (other than those referenced above) in the Arrangement was fair, from a financial point of view, to such Equal Shareholders. The oral opinion and final written opinion delivered to Equal's Board were reviewed, discussed and approved by the fairness committee of GHS in accordance with GHS' customary practices prior to delivery.

(d)     on pages 47-48 of the Proxy, the statement:

*Implied Shareholder Rate of Return Analysis*

Equal does not as a matter of course make long-term projections, but as part of the process of evaluating alternatives, Equal management provided selected information necessary to evaluate certain scenarios. Such information is further described in the section of this Circular entitled "*Certain Unaudited Prospective Financial and Operating Information*" beginning on page 51.

Using such information, two ranges of future well performance (estimated ultimate recoveries ("EUR") of 517 MBoe and 600 MBoe) and the forward pricing curves of oil and gas commodity prices as reported on the NYMEX as of December 4, 2013, with a range of realizations as to the pricing of natural gas liquids ("NGLs") relative to West Texas Intermediate ("WTI") as indicated in the table below, GHS then calculated what price per Equal Share an Equal Shareholder would be willing to pay if a 10-25% range of returns were to be required. Future returns to Equal Shareholders were calculated through December 31, 2016, to include a $0.05 per share per quarter dividend plus a terminal net asset value per share. The range of returns evaluated reflects GHS' experience for companies of similar size and risk, and considering the aggressiveness of the projected information and assumptions used.

| Scenario | EUR(1) (MBoe) | NGL % of WTI | Realized Oil% | Realized NGL% | Realized Gas% | Implied Share Price Based on IROR% | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | 10% (USD$) | 15% (USD$) | 20% (USD$) | 25% (USD$) |
| 1 | 517 | 35.0% | 96.0% | 89.0% | 87.0% | 3.61 | 3.17 | 2.79 | 2.48 |
| 2 | 517 | 38.5% | 96.0% | 89.0% | 87.0% | 4.21 | 3.68 | 3.24 | 2.87 |
| 3 | 517 | 43.0% | 96.0% | 89.0% | 87.0% | 5.09 | 4.45 | 3.91 | 3.46 |
| 4 | 517 | 53.0% | 96.0% | 89.0% | 87.0% | 6.92 | 6.03 | 5.28 | 4.66 |
| 5 | 600 | 35.0% | 96.0% | 89.0% | 87.0% | 4.29 | 3.75 | 3.30 | 2.93 |
| 6 | 600 | 38.5% | 96.0% | 89.0% | 87.0% | 4.93 | 4.31 | 3.79 | 3.35 |
| 7 | 600 | 43.0% | 96.0% | 89.0% | 87.0% | 5.88 | 5.13 | 4.50 | 3.98 |
| 8 | 600 | 53.0% | 96.0% | 89.0% | 87.0% | 7.83 | 6.81 | 5.97 | 5.26 |
| Mean | | | | | | 5.35 | 4.67 | 4.10 | 3.62 |

80.    These statements, identified in ¶¶71-79 above, are rendered materially misleading by the omissions because they paint an incomplete picture of how GHS selected and used the key inputs and assumptions in its financial analyses, which, without full disclosure of such information, calls into question DHS's ultimate conclusions that the Proposed Transaction is fair.

**Conflicts of Interest Affecting GHS**

81.    The Proxy omits material information concerning potential conflicts affecting GHS, including:

(a)    whether GHS has provided services in the past two years for Petroflow, TexOak Petro, or any affiliates or subsidiaries of either entity, and if so, the amount of compensation received for such services;

(b)    whether GHS has provided services in the past two years for Equal Energy and, if so, the amount of compensation received for such services; and

(c)    whether the Board was aware of how much money GHS has received and still stands to receive from Petroflow, TexOak Petro, or any affiliates or subsidiaries of either entity, in connection with any relationship, material or otherwise.

- 43 -

82.    The omission of this information renders the following statements in the Proxy materially misleading:

(a)    on page 40 of the Proxy, the statement:

**Recommendation of the Special Committee**

The Special Committee, having undertaken a thorough review of, and carefully considered, the proposed Arrangement and the alternatives available to Equal, and having taken into account such other matters as it considered relevant (as described below under the heading "*Reasons for the Recommendation of the Board and Special Committee*"), unanimously determined that the Arrangement is advisable, in the best interests of Equal and that the consideration to be received pursuant to the Arrangement by Equal Shareholders is fair, from a financial point of view. Accordingly, the Special Committee unanimously approved the Arrangement and the Compensation Proposal and recommended that the Board approve the Arrangement and Compensation Proposal and recommended that the Equal Shareholders vote "FOR" the Arrangement Resolution and "FOR" the Compensation Proposal.

(b)    on page 41 of the Proxy, the statement:

**Recommendation of our Board of Directors**

After careful consideration, and taking into account the recommendation of the Special Committee and all of the factors described below, the Board unanimously determined that the Arrangement is advisable, in the best interests of Equal and that the consideration to be received pursuant to the Arrangement by Equal Shareholders is fair, from a financial point of view, and authorized and approved the Arrangement and the Arrangement Agreement and the other transactions contemplated by the Arrangement Agreement, and the Board unanimously recommends that the Equal Shareholders vote "FOR" the approval of the Arrangement Resolution, the complete text of which is attached as Appendix C to this Circular.

The Board also unanimously recommends that Equal Shareholders vote "FOR" the Compensation Proposal.

(c)    on page 44 of the Proxy, the statement:

On December 6, 2013, GHS rendered its oral opinion to our Board (which was subsequently confirmed in writing by delivery of its final written

Fairness Opinion dated as of the same date) to the effect that, as of December 6, 2013, and based upon and subject to the various assumptions and limitations set forth therein, the consideration of USD$5.43 per share in cash to be received by the Equal Shareholders (other than those referenced above) in the Arrangement was fair, from a financial point of view, to such Equal Shareholders. The oral opinion and final written opinion delivered to Equal's Board were reviewed, discussed and approved by the fairness committee of GHS in accordance with GHS' customary practices prior to delivery.

(d)     on page 50 of the Proxy, the statement:

*Information About GHS*

As a part of its investment banking business, GHS is regularly engaged in the valuation of businesses in the energy industry and other industries and their securities in connection with mergers and acquisitions, underwritings, secondary distributions of listed and unlisted securities, private placements, and valuations for corporate and other purposes. Our Board selected GHS to be its financial advisor in connection with the Transaction and, subsequently selected GHS to render the Fairness Opinion in connection with the Transaction on the basis of such experience and knowledge of Equal.

GHS acted as financial advisor to our Board in connection with the Transaction. In connection with those services, GHS received a monthly advisory fee of USD$25,000 per month (in aggregate USD$200,000 through February 20, 2014) and will receive an estimated additional fee upon consummation of the Transaction of approximately USD$ 2 million (net of the credit of USD$200,000 for aggregate monthly advisory fees) based on the aggregate consideration paid by Petroflow Sub. With respect to the Fairness Opinion, GHS received a fixed fee of USD$150,000, which was payable upon first rendering the Fairness Opinion, regardless of the conclusions contained in the Fairness Opinion or whether or not the Arrangement is consummated. Also in connection with the above, Equal has agreed to reimburse GHS for its out-of-pocket and incidental expenses and indemnify GHS for certain liabilities arising out of it being so engaged. To the extent that Equal requests GHS to perform additional services not contemplated by the above-referenced agreements, additional fees may be mutually agreed upon by GHS and Equal.

In the ordinary course of its business, GHS and its affiliates may actively

trade securities of Equal for their own accounts or the accounts of their customers and, accordingly, may at any time hold a long or short position in such securities. GHS may also, in the future, provide investment banking and financial advisory services to Equal or Petroflow or entities that are affiliated with Equal or Petroflow, for which GHS would expect to receive compensation.

Consistent with applicable legal and regulatory requirements, GHS has adopted policies and procedures to establish and maintain the independence of GHS' research department and personnel. As a result, GHS' research analysts may hold opinions, make statements or investment recommendations and/or publish research reports with respect to Equal and the Arrangement and other participants in the Arrangement (including Petroflow) that differ from the opinions of GHS' investment banking personnel.

83.    A financial advisor plays a crucial role in mergers and acquisitions, facilitating the mechanics of the sales process, providing expertise considering the suitability of combinations with certain parties, and ultimately rendering an opinion on the fairness of a deal.    Therefore, it is important to retain an advisor that is both technically qualified and not subject to any conflicts of interest.    It is equally important that any potential conflicts of interest be disclosed to a company's shareholders so that they can assess the credibility of the work and analyses performed by the financial advisor. Indeed, if the financial advisor has conflicting interests, they may impact the financial advisor's judgment in rendering an unbiased fairness opinion.

**Financial Projections**

84.    GHS relied upon certain financial forecasts for the Company in performing its financial analyses, including the Selected Public Companies Analysis and the Implied Shareholder Rate of Return Analysis.    The Proxy, however, does not disclose the following:

(a)   the individual cash flow items that reconcile projected EBITDA to net cash flow for the three periods presented; and

(b)   the financial projections for Equal Energy provided by management and relied upon by GHS for purposes of its analysis, for FYs 2014-2016, under both 517 MBOE estimated ultimate recoveries ("EUR") and 600 MBOE EUR, for the following items:

(i)   earnings before interest and taxes (or depreciation, depletion, and amortization);

(ii)   exploration costs;

(iii)   capital expenditures;

(iv)   changes in net working capital; and

(v)   the income measure(s) discounted to present value as part of the Implied Shareholder Rate of Return Analysis.

85.   The omission of this information renders the following statements in the Proxy materially misleading:

(a)   on page 40 of the Proxy, the statement:

**Recommendation of the Special Committee**

The Special Committee, having undertaken a thorough review of, and carefully considered, the proposed Arrangement and the alternatives available to Equal, and having taken into account such other matters as it considered relevant (as described below under the heading "*Reasons for the Recommendation of the Board and Special Committee*"), unanimously determined that the Arrangement is advisable, in the best interests of Equal and that the consideration to be received pursuant to the Arrangement by Equal Shareholders is fair, from a financial point of view. Accordingly, the Special Committee unanimously approved the Arrangement and the

Compensation Proposal and recommended that the Board approve the Arrangement and Compensation Proposal and recommended that the Equal Shareholders vote "FOR" the Arrangement Resolution and "FOR" the Compensation Proposal.

    (b)    on page 41 of the Proxy, the statement:

**Recommendation of our Board of Directors**

After careful consideration, and taking into account the recommendation of the Special Committee and all of the factors described below, the Board unanimously determined that the Arrangement is advisable, in the best interests of Equal and that the consideration to be received pursuant to the Arrangement by Equal Shareholders is fair, from a financial point of view, and authorized and approved the Arrangement and the Arrangement Agreement and the other transactions contemplated by the Arrangement Agreement, and the Board unanimously recommends that the Equal Shareholders vote "FOR" the approval of the Arrangement Resolution, the complete text of which is attached as Appendix C to this Circular.

The Board also unanimously recommends that Equal Shareholders vote "FOR" the Compensation Proposal.

    (c)    on page 44 of the Proxy, the statement:

On December 6, 2013, GHS rendered its oral opinion to our Board (which was subsequently confirmed in writing by delivery of its final written Fairness Opinion dated as of the same date) to the effect that, as of December 6, 2013, and based upon and subject to the various assumptions and limitations set forth therein, the consideration of USD$5.43 per share in cash to be received by the Equal Shareholders (other than those referenced above) in the Arrangement was fair, from a financial point of view, to such Equal Shareholders. The oral opinion and final written opinion delivered to Equal's Board were reviewed, discussed and approved by the fairness committee of GHS in accordance with GHS' customary practices prior to delivery.

    (d)    On page 51 of the Proxy, the statement:

| Selected Projected Information Provided by Management | 2013(1) | 2014(2) |
|---|---|---|
| *(USD$ in millions)* | | |
| Revenues | 66.3 | 78.3 |
| EBITDA | 32.0 | 44.0 |

(1)   Management financial estimates based on NYMEX forward strip pricing as of November 26, 2013
(2)   Management financial estimates based on NYMEX forward strip pricing as of December 4, 2013

| Ranges Across Implied Shareholder Rate of Return Scenario* | 2014 | | 2015 | | 2016 | |
|---|---|---|---|---|---|---|
| | Low | High | Low | High | Low | High |
| *(USD$ in millions)* | | | | | | |
| *Assuming 517 Mboe EURs:* | | | | | | |
| Equivalent daily production (Boe/day) | 7,411 | 7,411 | 8,326 | 8,326 | 9,128 | 9,128 |
| Net cash flow | (13.1) | (5.2) | (0.6) | 0.5 | 0.1 | 5.8 |
| PV-10 of Reserves at end of period | 220.7 | 313.7 | 241.4 | 341.2 | 254.9 | 358.5 |
| Revenues | 70.2 | 89.2 | 77.0 | 97.0 | 83.4 | 104.5 |
| EBITDA | 41.9 | 59.7 | 46.0 | 64.8 | 50.0 | 67.3 |
| *Assuming 600 Mboe EURs:* | | | | | | |
| Equivalent daily production (Boe/day) | 7,814 | 7,814 | 8,981 | 8,981 | 10,003 | 10,003 |
| Net cash flow | (10.7) | (2.3) | (2.9) | 5.4 | (0.5) | 12.8 |
| PV-10 of Reserves at end of period | 236.5 | 335.3 | 263.5 | 371.4 | 278.7 | 391.1 |
| Revenues | 73.2 | 93.0 | 82.4 | 103.8 | 90.9 | 113.9 |
| EBITDA | 44.0 | 62.6 | 49.7 | 69.9 | 55.1 | 76.8 |

86.   The omissions in the Company's financial projections render the above statements materially misleading because without full access to the estimates of Equal Energy's future business prospects, Equal Energy shareholders cannot reliably compare the intrinsic value of the Company to the consideration offered by the Proposed Transaction, and thus cannot determine whether the Proposed Transaction is indeed fair, as defendants and their financial advisor claim.

## CLASS ACTION ALLEGATIONS

87.   Plaintiff brings this action for himself and on behalf of all holders of Equal Energy's common stock which have been or will be harmed by the conduct described herein (the "Class"). Excluded from the Class are the defendants and any individual or entity affiliated with any defendant.

88.   This action is properly maintainable as a class action.

89.   The Class is so numerous that joinder of all members is impracticable. According to Equal Energy's SEC filings, there were more than 35.8 million shares of

common stock outstanding as of December 6, 2013.

90.     There are questions of law and fact that are common to the Class and which predominate over questions affecting any individual Class member.   The common questions include the following:

(a)     whether the Proposed Transaction was the result of an entirely fair process and at an entirely fair price to the Company's shareholders;

(b)     whether the Individual Defendants have breached their fiduciary duties of undivided loyalty, independence, or due care with respect to plaintiff and the other members of the Class in connection with the Proposed Transaction;

(c)     whether the Individual Defendants engaged in self-dealing in connection with the Proposed Transaction;

(d)     whether the Individual Defendants breached any of their other fiduciary duties owed to plaintiff and the other members of the Class in connection with the Proposed Transaction, including the duties of loyalty, diligence, and fair dealing;

(e)     whether the Individual Defendants fully and fairly disclosed all material information necessary for the public shareholders to cast an informed vote on the Proposed Transaction; and

(f)     whether Equal Energy, Petroflow, and Petroflow Sub aided and abetted the Individual Defendants' breaches of fiduciary duties.

91.     Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff does not have any interests adverse to the Class.

92.     Plaintiff has retained competent counsel experienced in litigation of this

nature and will fairly and adequately represent and protect the interests of the Class.

93.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

94.    Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

95.    As defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, the damages sought by way of this action are recoverable by the Class as a whole.

## COUNT I

### Against the Individual Defendants and Equal Energy for Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 Promulgated Thereunder

96.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

97.    The Individual Defendants and Equal Energy disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

98.    The Proxy was prepared, reviewed, and/or disseminated by the Individual Defendants and Equal Energy.  It misrepresented and/or omitted material facts, including

material information about the actual intrinsic value of the Company.

99.     In so doing, the Individual Defendants and Equal Energy made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

100.   The Individual Defendants and Equal Energy were at least negligent in filing the Proxy with these materially false and misleading statements.

101.   The omissions and false and misleading statements in the Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to shareholders.

102.   By reason of the foregoing, the Individual Defendants and Equal Energy have violated section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

## COUNT II

### Against the Individual Defendants for Violation of Section 20(a) of the Exchange Act

103.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

104.   The Individual Defendants acted as controlling persons of Equal Energy within the meaning of section 20(a) of the Exchange Act as alleged herein.  By virtue of

their positions as officers and/or directors of Equal Energy, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.

105.   Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

106.   In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, each is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of the Proxy.

107.   In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy purports to describe the various issues and information that they reviewed and considered, descriptions of which had input from the directors. By virtue of the foregoing, the Individual Defendants have violated section 20(a) of the

Exchange Act.

108.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated section 14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein.   By virtue of their positions as controlling persons, these defendants are liable pursuant to section 20(a) of the Exchange Act.

## COUNT III

**Breach of Fiduciary Duties Against the Individual Defendants**

109.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

110.    The Individual Defendants have violated the fiduciary duties of care, loyalty, and independence owed to the public shareholders of Equal Energy and has acted to put their personal interests ahead of the interests of Equal Energy's shareholders.

111.    By the acts, transactions, and course of conduct alleged herein, defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive plaintiff and other members of the Class of the true value inherent in and arising from Equal Energy.

112.    As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty and independence owed to the shareholders of Equal Energy because, among other reasons:

(a)    they failed to take steps to maximize the value of Equal Energy to its public shareholders;

(b)    they failed to properly value Equal Energy and its various assets and operations; and

(c)    they ignored or did not protect against the numerous conflicts of interest resulting from their own interrelationships or connection with the Proposed Transaction.

113.    Because the Individual Defendants dominated and controlled the business and corporate affairs of Equal Energy, and were in possession of or had access to private corporate information concerning Equal Energy assets, business, and future prospects, there existed an imbalance and disparity of knowledge and economic power between them and the public shareholders of Equal Energy which made it inherently unfair for them to pursue and recommend any proposed transaction wherein they would reap disproportionate benefits to the exclusion of maximizing shareholder value.

114.    By reason of the foregoing acts, practices, and course of conduct, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward plaintiff and the other members of the Class.

115.    The Individual Defendants are engaging in self-dealing, are not acting in good faith toward plaintiff and the other members of the Class, and have breached their fiduciary duties to the members of the Class.

116.    As a result of the defendants' breaches of fiduciary duty as outlined herein, plaintiff and the other members of the Class have been damaged.

## COUNT IV

### Aiding and Abetting the Individual Defendants' Breaches of Fiduciary Duty

**Against Equal Energy, Petroflow, and Petroflow Sub**

117.   Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

118.   Defendants Equal Energy, Petroflow, and Petroflow Sub are sued herein as aiders and abettors of the breaches of fiduciary duty outlined above by the Individual Defendants.

119.   The Individual Defendants breached their fiduciary duties of loyalty, care, candor, and good faith and fair dealing to the Equal Energy shareholders.

120.   Such breaches of fiduciary duties could not and would not have occurred but for the conduct of defendants Equal Energy, Petroflow, and Petroflow Sub in aiding and abetting such breaches.

121.   Defendants Equal Energy, Petroflow, and Petroflow Sub had knowledge that they were aiding and abetting the Individual Defendants' breaches of their fiduciary duties to Equal Energy shareholders, and thus knowingly participated in such breaches.

122.   Defendants Equal Energy, Petroflow, and Petroflow Sub provided substantial assistance to the Individual Defendants in the breach of their fiduciary duties owed to Equal Energy shareholders.

123.   As a result of defendants Equal Energy, Petroflow, and Petroflow Sub's aiding and abetting the Individual Defendants' breaches of fiduciary duties, plaintiff and the other members of the Class have been damaged.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment in his favor and in favor of the Class

and against defendants as follows:

A.      Declaring that this action is properly maintainable as a class action and appointing plaintiff as the Class representative;

B.      Finding that the Individual Defendants intentionally, recklessly, or with bad-faith breached their fiduciary duties of loyalty, due care, independence, candor, disclosure, and/or good faith and fair dealing as owed to the Class members under applicable state and federal law upon entering into the Arrangement Agreement and disseminating the false and materially misleading Proxy;

C.      Finding that Equal Energy, Petroflow, and Petroflow Sub aided and abetted the Individual Defendants' violations of state and federal law;

D.      Awarding plaintiff and the Class all appropriate money damages for the Individual Defendants' violations of state law, and the aiding and abetting of such violations by Equal Energy, Petroflow, and Petroflow Sub;

E.      Awarding plaintiff the costs and disbursements of this action, including all reasonable attorneys' and experts' fees; and

F.      Granting all such other and further relief as may be deemed just and proper.

Dated: February 4, 2014                 DERRYBERRY & NAIFEH, LLP


                                        /s/ Darren B. Derryberry
                                        DARREN B. DERRYBERRY

                                        4800 North Lincoln Boulevard
                                        Oklahoma City, OK 73105
                                        Telephone: (405) 528-6569
                                        Facsimile: (405) 528-6462
                                        dderryberry@derryberrylaw.com

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
STEPHEN J. ODDO
EDWARD B. GERARD
JUSTIN D. RIEGER
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
brobbins@robbinsarroyo.com
soddo@robbinsarroyo.com
egerard@robbinsarroyo.com
jrieger@robbinsarroyo.com

Attorneys for Plaintiff

924889

## CERTIFICATION OF PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAW

Jonathan Scripture ("Plaintiff") declares as to the claims asserted, or to be asserted, under the federal securities laws, that:

1.      Plaintiff has reviewed the Class Action Complaint and has retained Robbins Arroyo LLP as counsel in this action for all purposes.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are subject of this action:

| SECURITY | TRANSACTION (Purchase/Sale) | QUANTITY | TRADE DATE | PRICE PER SHARE/SECURITY |
|----------|------------------------------|----------|------------|---------------------------|
| EENC | Purchase = P | 400 | 11/28/03 | $8.66 |
| EENC | Sale = S | 400 | 3/4/04 | 14.10 |
| EENC | P | 600 | 12/28/04 | 17.94 |
| EENC | S | 600 | 3/28/05 | 20.35 |
| EENC | P | 650 | 6/8/05 | 19.30 |
| EENC | S | 650 | 6/13/05 | 21.00 |
| EENC | P | 1175 | 8/26/05 | 20.29 |

4.      Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary, and Plaintiff is willing to serve as a lead plaintiff, a lead plaintiff being a representative party who acts on behalf of other class members in directing the action.

5.      Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws within the past three years, unless otherwise stated in the space below: _____

_____

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

7.      Plaintiff represents and warrants that he is fully authorized to enter into and execute this certification.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 31 day of January, 2014.

_____
JONATHAN SCRIPTURE

| SECURITY | TRANSACTION (Purchase/Sale) | QUANTITY | TRADE DATE | PRICE PER SHARE/SECURITY |
|---|---|---|---|---|
| EENC | P | 225 | 8/29/05 | $20.28 |
| EENC | P | 3,600 | 9/7/05 | 19.38 |
| EENC | P | 500 | 10/7/05 | 22.65 |
| EENC | S | 6000 | 10/14/05 | 21.55 |
| EENC | P | 6500 | 11/21/05 | 20.35 |
| EENC | P | 500 | 12/6/05 | 20.17 |
| EENC | P | 1000 | 12/9/05 | 19.75 |
| EENC | P | 100 | 12/12/05 | 17.98 |
| EENC | P | 900 | 12/12/05 | 18.36 |
| EENC | P | 150 | 12/20/05 | 16.30 |
| ENT | S | 150 | 3/2/06 | 18.59 |
| ENT | P | 400 | 3/8/06 | 17.03 |
| ENT | P | 250 | 3/22/06 | 12.04 |
| ENT | P | 650 | 5/15/06 | 14.25 |
| ENT | P | 250 | 6/22/06 | 13.00 |
| ENT | P | 450 | 8/22/06 | 11.78 |
| ENT | P | 500 | 9/1/06 | 11.01 |
| ENT | P | 235 | 8/30/07 | 4.74 |
| ENT | P | 265 | 11/30/07 | 1.13 |
| ENT | P | 3000 | 12/21/07 | 1.15 |
| ENT | P | 300 | 9/10/08 | 2.97 |
| ENT | P | 700 | 10/2/08 | 1.97 |
| ENT | P | 300 | 11/14/08 | 1.10 |
| ENT | P | 604 | 2/23/09 | 0.48 |
| ENT | P | 2076 | 2/26/09 | 0.53 |
| ENT | P | 2000 | 7/6/09 | 1.19 |
| ENT | P | 2000 | 8/14/09 | 1.24 |
| NAME CHANGE and | | REVERSE SPLIT | | 3:1 (6/8/10) |
| EQU | P | 2000 | 10/3/11 | $4.27 |
| EQU | P | 3000 | 1/15/13 | 2.90 |
| EQU | P | 62 | 5/16/13 | 3.67 |
| EQU | P | 188 | 9/26/13 | 4.64 |
| EQU | P | 500 | 11/4/13 | 4.52 |
| | | | | |
| | | | | |

Name change ⇒

continued   [signature]   1/31/14